FRED DORTON, ESQ., SBN 237121
fred@thedfirm.com
THE D FIRM, A Professional Law
Corporation
9701 Wilshire Boulevard, Tenth Floor
Beverly Hills, CA 90212
Telephone: (310) 734-6455
Facsimile: (310) 734-6411

LANCE M. FILER, ESQ., SBN 284189
lance@filerpalmer.com
FILER-PALMER
9701 Wilshire Boulevard, Tenth Floor
Beverly Hills, CA 90212
Telephone: (310) 601-7113
Facsimile: (310) 388-0390

*Attorneys for Plaintiffs, Rayven Vinson, Christian Sutton, Olaoluwa Bayode, Debbie Rumbo, Frances Wang, and Jason Sneed*

*Attorneys for Plaintiff, Teremy Jackson*

[Additional Counsel on Signature Page]

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

RAYVEN VINSON, an Individual;
CHRISTIAN SUTTON, an Individual;
OLAOLUWA BAYODE, an
Individual; DEBBIE RUMBO, an
Individual; FRANCES WANG, an
Individual, JASON SNEED, an
Individual; and TEREMY JACKSON,
an Individual,

        Plaintiffs,

    v.

CITY OF LOS ANGELES, A Public
Entity; UNIVERSITY OF SOUTHERN
CALIFORNIA, A Private Corporate
Entity; CHIEF JOHN THOMAS, in his
individual and official capacity as Chief
of USC Department of Public Safety;
LAPD OFFICER CARLYLE; LAPD
OFFICER ROSE; LAPD OFFICER
MORAN; LAPD OFFICER

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Case No.: CV 14-4488-PLA

**SECOND AMENDED COMPLAINT**

CIVIL RIGHTS VIOLATIONS
PURSUANT TO 42 USC §§ 1983
    1. Excessive Force
    2. False Arrest and Malicious
       Prosecution
    3. Failure to Intervene
    4. *Monell* Claim
    5. Deprivation of Equal Protection

STATE LAW CLAIMS:
    6. Intentional Infliction of
       Emotional Distress
    7. Assault and Battery
    8. Assault
    9. Violation of Unruh Act – Racial
       Discrimination
    10. False Promise
    11. Negligent Misrepresentation

1

ROCKETT; LAPD OFFICER PEAKE;  )
LAPD OFFICER CHIU; LAPD        )
OFFICER WOLFCHIEF; LAPD        )
OFFICER AYALA; LAPD OFFICER    )
CORDOBA; LAPD SERGEANT         )
WASHINGTON; LAPD OFFICER       )          DEMAND FOR JURY TRIAL
BARRIENTOS; LAPD OFFICER       )
MARX; and DOE DEFENDANTS       )
1-10, Inclusive;               )
                               )
            Defendants.        )

# SECOND AMENDED COMPLAINT

## I.

## INTRODUCTION

1.      On the evening of May 3, 2013, and into the early morning hours of May 4, 2013, two parties of mostly college-age men and women attending the University of Southern California took place in two separate houses directly across the street from one another. The parties were, for nearly all intents and purposes, identical to one another, save for one prominent distinction: one of the parties was hosted and attended by predominantly Caucasian students; the other party, by predominantly African-American and minority students.

2.      There were other distinctions that should have mattered, of course. For example, the mostly minority student party properly registered their party with the University of Southern California's Department of Public Safety, the University's law enforcement arm. The hosts of the mostly minority student party also properly checked student ID's at the door, a requirement for such parties. The mostly Caucasian party did neither of these things.

3.      However, when the Los Angeles Police Department and USC's Department of Public Safety arrived in the early morning of May 4, 2013, to respond to a "noise complaint", their treatment of the similarly situated party-goers

was anything but equal, reasonable, or constitutional. The LAPD, in conjunction with officers from USC's Department of Public Safety, proceeded to use an excessive display of force – nearly **seventy-nine officers** from both departments in all – in order to aggressively disperse the peaceful and compliant attendees of the predominately minority party. The officers, some of whom showed up in riot gear, issued contradictory orders, and used force to corral African-American and minority students away from the scene while simultaneously using a "skirmish line" to block the students' exit.

4.     In dramatic contrast, the hosts and attendees of the Caucasian party were allowed to stay inside the house and continue their festivities.

5.     In the confusion that followed as a result of the defendant officers' conduct, Plaintiffs RAYVEN VINSON, CHRISTIAN SUTTON, OLAOLUWA BAYODE, DEBBIE RUMBO, FRANCES WANG, JASON SNEED, and TEREMY JACKSON, all attendees of the African-American and minority party, were each forcefully arrested without probable cause while they were either attempting to peacefully leave the scene as instructed by officers, or as they attempted to film the excessive and unreasonable treatment by the officers against their fellow students.

6.     After their arrests, Plaintiffs were forced to endure the probability of being prosecuted for crimes they did not commit, as the City Attorney's Office delayed the decision of whether or not to prosecute them for more than a month. During this time period, each student's personal life suffered greatly, and the University of Southern California, despite promises to accommodate the difficulties they were facing, did nothing.

7.     As a result, the Civil Rights of each Plaintiff have been violated, and each of them has suffered physical and emotional harm entitling each to the damages alleged in this Complaint.

**II.**

3

**VENUE & JURISDICTION**

8.     This action is brought pursuant 42 USC §§ 1983, and the Fourth and Fourteenth Amendments to the United States Constitution.  Jurisdiction is founded on 29 USC §§1331 and 1343(1), (2), (3) and (4), and the aforementioned statutory and Constitutional provisions.

9.     Venue is proper in the United States District Court for the Central District of California, as the injury and claimed violation of rights occurred in the City of Los Angeles, California, within the boundaries of this court.

**III.**

**PARTIES**

10.     Plaintiffs RAYVEN VINSON ("Vinson"), CHRISTIAN SUTTON ("Sutton"), OLAOLUWA BAYODE ("Bayode"), DEBBIE RUMBO ("Rumbo"), FRANCES WANG ("Wang"), JASON SNEED ("Sneed"), and TEREMY JACKSON ("Jackson") (collectively, "Plaintiffs") are, and at all times relevant to this Complaint were, residents of the City and County of Los Angeles, California.

11.     Defendant CITY OF LOS ANGELES is a public entity duly organized and existing under and by virtue of the laws of the state of California.

12.     At all times relevant to this Complaint, Defendants LAPD OFFICER CARLYLE (Serial No. 36156); LAPD OFFICER ROSE (Serial No. 38815); LAPD OFFICER MORAN (Serial No. 38914); LAPD OFFICER ROCKETT (Serial No. 41226); LAPD OFFICER PEAKE (Serial No. 34968); LAPD OFFICER CHIU (Serial No. 41053); LAPD OFFICER WOLFCHIEF (Serial No. 38168); LAPD OFFICER AYALA (Serial No. 40555); LAPD OFFICER CORDOBA (Serial No. 37022); LAPD SERGEANT WASHINGTON (Serial No. 32231); LAPD OFFICER BARRIENTOS (Serial No. 40138); and LAPD OFFICER MARX (Serial No. 37650), (collectively, "LAPD Defendants" or "LAPD Individual Defendants") were employees and/or agents of the Los Angeles Police Department acting within the course and scope of their employment and

4

SECOND AMENDED COMPLAINT

1   acting under color of law when committing the acts and omissions herein alleged.

2       13.   Defendant UNIVERSITY OF SOUTHERN CALIFORNIA ("USC")

3   is a private for-profit business entity located in the City and County of Los

4   Angeles, California. The University of Sothern California Department of Public

5   Safety ("USC DPS") was, at all times relevant to this Complaint, the law-

6   enforcement branch of Defendant USC, an agent of Defendant USC, acted within

7   the course and scope of said agency, and acted in coordination and under a

8   memorandum of understanding with the LAPD with the ability and authority under

9   law to effect custodial arrest and detention of civilians and deprivation of their

10  freedoms.

11      14.   Defendant USC DPS CHIEF JOHN THOMAS ("CHIEF THOMAS"),

12  formerly named in the First Amended Complaint ("FAC") as DOE DEFENDANT

13  NUMBER 1 as a USC DPS Supervising Officer, is and at all times relevant hereto

14  was, the Chief of USC DPS and resided within the jurisdictional boundaries of this

15  Court. Upon information and belief, at all relevant times CHIEF THOMAS was

16  the final policymaker with respect to the day to day operation of the USC DPS as

17  well as the training, supervision, and on-duty performance of USC DPS Officers.

18  During the events leading up to and giving rise to this civil action, Defendant

19  CHIEF THOMAS was an employee and/or agent of Defendant USC acting within

20  the course and scope of his employment when committing the acts and omissions

21  herein alleged. CHIEF THOMAS is sued in his individual capacity, and in his

22  official capacity as Chief of USC DPS.

23      15.   On information and belief Plaintiffs allege that there were more than

24  10 USC DPS officers present at the scene of the incident and engaged in the

25  conduct complained of herein, or active and integral participants thereto, and at

26  least one USC DPS Supervising Officer at whose direction or with whose approval

27  the actions complained of herein took place. Plaintiffs are ignorant of the true

28  names and capacities of these Defendants and therefore sue them herein as DOE

SECOND AMENDED COMPLAINT

DEFENDANTS 2 through 10, inclusive.   Plaintiffs will amend this complaint to allege their true names and capacities when same shall have been ascertained. Plaintiffs are informed and believe and thereon allege that each of the fictitiously named defendants is responsible in some manner for the occurrences herein alleged, and those Plaintiffs' injuries as herein alleged were proximately caused by the acts and/or omissions of said fictitiously named defendants.

## IV.
## GENERAL ALLEGATIONS

16.    One month prior to the arrests of Plaintiffs giving rise to this action, in April 2013, nine (9) LAPD squad cars and officers in riot gear arrived at a house party hosted by African-American USC students two (2) blocks from the USC campus. The LAPD indicated they were responding to a "noise complaint" despite the very heavy police presence.

17.    The African-American USC students present committed no crime and were not threatening the public, and yet were subjected to this excessive showing of force.

18.    During the encounter, a USC student interviewed a LAPD officer named "Officer Carlyle" (present at both the April 13 incident and the incident underlying the instant Complaint, and named as a Defendant herein) regarding the unequal application of police force with respect to minority and African American students at USC.

19.    During that interview, it came to light that Defendant USC directly telephoned the police to shut down the African American party. The student asked Defendant Carlyle  why the LAPD uses drastically more force and much larger units when responding to predominantly African American parties as opposed to predominantly Caucasian parties. Defendant Carlyle stated: **"They [referring to USC DPS] call for us, and they [USC DPS] give us a different story than what's actually happening."**

20.     The April 13 incident continued an unfortunate pattern of USC prompting and participating in, and LAPD using, excessive and unreasonable showing of police force and police interference in the lawful and peaceful activities of USC's African-American student population.

21.     Defendants USC and LAPD had actual knowledge of this pattern and practice of marginalizing and stigmatizing the African-American students through such police interference, a fact which is confirmed by USC's setting up a "Town Hall" meeting at the USC campus on May 7, 2013, to discuss with the Public and the students the very issue of racially unequal treatment of black students by the USC DPS and LAPD on and around the USC campus.

22.     Sadly, the meeting was simply too little, too late, to change the pattern and practice of subjecting African-American students to unequal and excessive police force that had cemented through years of indifference on the part of Defendants USC and CITY OF LOS ANGELES, by and through their policing units the USC DPS and LAPD, and policy makers such as Defendant CHIEF THOMAS.

23.     Four days before the May 7th Town Hall meeting was scheduled to take place, on May 3, 2013, two (2) parties hosted by USC students took place at two (2) homes, which were across the street from one another at the addresses of 1223 W. 23rd Street ("1223") and 1222 W. 23rd Street ("1222") in Los Angeles, California. A large number of students attended both parties, the only major difference being that predominantly African American and minority students attended the party at 1222, while predominantly Caucasian students attended the party at 1223.

24.     The gathering at 1222, with the predominantly African-American and minority students, commenced in celebration of the successful completion of another year of college.

25.     The party hosts of the 1222 party registered their party with USC

SECOND AMENDED COMPLAINT

Department of Public Safety ("USC DPS") prior to the event, and the party organizers checked student identification cards at the door to prevent any non-students from attending the celebration.

26.     The hosts of the 1223 party, which was predominantly attended by Caucasians, neither registered their party with the USC DPS nor did they check student identification cards at the door. Additionally, the 1223 party served alcohol, whereas the 1222 party did not. These facts came to light when the host of the 1223 party spoke in front of a panel for a Town Hall meeting organized at the USC Campus after this incident.

27.     At 7:00 pm on May 3, 2013, the Los Angeles Police Department ("LAPD") received an alleged noise complaint in connection with the 1222 and 1223 parties. Police did not arrive on the scene until May 4, 2013 at approximately 1:50 am, almost seven (7) hours after the alleged complaint.

28.     Upon information and belief, Plaintiffs allege that when police units did arrive, USC DPS prompted and through false and exaggerated reporting deliberately organized and/or requested an excessively forceful police response to a simple noise complaint.

29.     In total, approximately seventy-nine (79) policing units consisting of LAPD officers, including Individual Defendants, and USC DPS officers, including Doe Defendants 2-10, arrived at the scene of the incident and began working in concert with one another to shut down and disburse **only the minority student party.**

30.     Defendant LAPD Officers Chiu and Carlyle visited the 1222 residence, which contained a demographic of minority and black students, and commanded the host to shut the party down. The host complied, and the students began to vacate the premises.

31.     Defendant LAPD Officers Chiu and Carlyle then visited the 1223 residence only to issue a warning about the noise level, and told the Caucasian

SECOND AMENDED COMPLAINT

1   students to "stay safe" inside the house. After advising the predominantly

2   Caucasian students attending the 1223 party, the Defendants returned to the

3   predominantly minority and African-American gathering at the 1222 party.

4       32.   During or about the same time, members of the LAPD and USC DPS

5   DOE DEFENDANTS 2-10, **each of them armed and in full badge and uniform**,

6   began forming a barricade on the street in front of the 1222 house. A group of USC

7   DPS DOE DEFENDANTS 2-10 participated directly in, and upon information and

8   belief actually organized a large "skirmish line" to block one avenue of egress from

9   African-American students including Plaintiffs simply attempting to leave the

10  scene peacefully and comply with other officers' commands to disburse.

11      33.   During the chaos that ensued, several officers surrounded Nathaniel

12  Howard ("Howard"), host of the 1222 party, against the side of his home,

13  abrasively seizing him. At all times, Howard was extremely calm and in no fashion

14  resisting arrest.

15      34.   Concurrently, Plaintiff Christian Sutton ("Sutton"), along with several

16  other students, witnessed the unprovoked detention and arrest of fellow student

17  Howard while they attempted to exit the premises.  Sutton began taking video of

18  the misconduct by defendants. An officer angrily yelled into Sutton's face to move

19  back even though Sutton was several feet away from officers and was doing

20  nothing illegal.

21  **ARREST OF PLAINTIFF SUTTON**

22      35.   Sutton's video shows officers leading Howard away, when suddenly,

23  the video goes black, and Sutton is audibly tackled to the ground by Defendant

24  LAPD Officers Carlyle, Rockett, Peake, and Chiu.

25      36.   Defendant Officers lunged at and arrested Sutton without probable

26  cause and solely to punish him for the exercise of his rights and the video taping of

27  the misconduct and to dissuade citizens from ever attempting to obtain evidence of

28  LAPD misconduct.

SECOND AMENDED COMPLAINT

37.     Defendant LAPD Officers Carlyle, Rockett, Peake, and Chiu injured Sutton's knee and shoulder while arresting him. Defendants Carlyle, Rockett, Peake, and Chiu also intentionally placed unreasonably tight handcuffs on Sutton. When Sutton complained that the cuffs were too tight and asked that they be adjusted, Officers Carlyle, Rockett, Peake, and Chiu refused to do so. As a result of the unnecessary use of excessive force, Sutton suffered abrasions to his knee, shoulder, and wrists, all of which have left Plaintiff Sutton with permanent scarring.

**ARREST OF PLAINTIFF JACKSON**

38.     After the unprovoked detention and arrest of Howard and use of excessive and unreasonable force on Sutton, LAPD officers, and USC DPS Doe Defendants 2-10 forced the partygoers onto the streets in the middle of the night.

39.     While the students attempted to exit the premises and disperse as commanded by LAPD and USC DPS DOE DEFENDANTS, additional LAPD officers and USC DPS DOE DEFENDANTS, many outfitted in riot gear, began to form a barricade around the surrounding area, blocking the students such that they were unable to get to their vehicles. The barricade also forced the students into the street with traffic, endangering their safety and lives.

40.     During this period, Defendant LAPD Officers Wolfchief and Ayala violently arresting Plaintiff Teremy Jackson ("Jackson").

41.     As Jackson attempted to vacate the area of the party as directed, the LAPD and USC DPS' skirmish line blocked his exit. As the students were herded, by officers, away from the skirmish line, Jackson began videotaping the police activity as he dispersed.

42.     Defendant LAPD Officers became angry that Jackson was documenting their illegal and wrongful conduct and activity, and as a result, several Defendant Officers, including arresting Officers, LAPD Defendants Wolfchief and Ayala, violently slammed Jackson against a vehicle. Plaintiff

Jackson was violently arrested despite the fact that Jackson was completely cooperative, made no sudden movements, and was non-confrontational.

43.     Plaintiff Jackson's arrest lacked probable cause.

44.     Although Jackson did not make any attempt to resist arrest, Defendants Wolfchief and Ayala handcuffed Jackson and yanked his arms up at an unnaturally high and physiologically uncomfortable angle. As a result of LAPD's excessive use of force, Jackson suffered a fractured scapula and sprains to his wrist and elbow.

45.     During Jackson's arrest a USC DPS DOE DEFENDANT pulled up in his marked patrol vehicle, got out and stood with his hand on his gun no more than fifteen feet away, and watched the entire arrest take place. This USC DOE DEFENDANT did nothing to help Plaintiff Jackson, or intervene on his behalf as his civil rights were being violated.

**ARREST OF PLAINTIFF VINSON**

46.     While LAPD officers apprehended USC student Teremy Jackson, another group of Defendant LAPD Officers, which included Defendant Officer Cordoba and LAPD Sergeant Washington, violently arrested Plaintiff Rayven Vinson ("Vinson").

47.     Vinson was handcuffed, lying on the concrete face-down, and crying out in pain. As Vinson began to writhe on the ground in pain and panic, Defendant Cordoba placed his foot, with the weight of his body, on the back of a handcuffed Vinson's shoulder.

48.     Due to the heavy weight of the male officer, Vinson screamed out in pain, "Ow! My back! You're hurting my back!" all to no avail.

49.     Defendant Cordoba, however, continued his excessive and unnecessary conduct.

50.     During her arrest a USC DPS DOE DEFENDANT was standing no more than fifteen feet away, watching the entire arrest take place and was within

SECOND AMENDED COMPLAINT

earshot of Vinson's cries for help, and did nothing to help Vinson or intervene on her behalf as her civil rights were being violated.

51.     Vinson at no time posed a threat nor in any way resisted. She is a fragile and petite female. Lying face-down on the ground, she could never have posed a threat to Defendant Cordoba or Defendant Washington. As such, the foot pressed firmly and painfully on her back was excessive, unreasonable, and a manifest display of disproportionate force.

**ARREST OF PLAINTIFF WANG**

52.     Plaintiff Frances Wang ("Wang"), was one of the Plaintiffs blocked in by the LAPD and USC DPS officer barricade, and was unable to leave the scene.

53.     LAPD and USC DPS DOE DEFENDANTS, who participated directly in and led the skirmish line, barred Wang from accessing her vehicle because it was beyond the skirmish line. In search of another way to access her car, Wang proceeded on foot in an attempt to comply with the LAPD's impossible command to disperse into traffic while being barricaded and prevented from dispersing.

54.     In the confusion and panic that ensued, as Wang attempted to disperse, along with other students, an unknown Defendant officer shoved Wang. Students took off running. Wang, who was wearing high heels, was unable to run away from the area. While Wang was limping away in shock and pain, an unknown Defendant officer came up behind her, grabbed her arms tightly, and placed handcuffs on her wrists.

55.     Wang's arrest was indiscriminate and lacked probable cause.

56.     Wang's arrest took place approximately twenty feet away from a USC DPS DOE DEFENDANT, who watched her illegal arrest take place without intervening on her behalf.

57.     Wang's arrest also took place in full view of the skirmish line, including LAPD unnamed officers and USC DPS Doe Defendants. Not only did the conduct of these officers and USC DPS Doe Defendants cause Wang confusion

SECOND AMENDED COMPLAINT

1  and fear, their conduct effectively blocked Wang's peaceful exit from the scene,

2  resulting in her eventual arrest. These officers in the skirmish line, including at

3  least ten USC DPS officers, comprised in part of several of DOE DEFENDANTS

4  2-10, stood and watched Wang get arrested without probable cause, in violation of

5  her civil rights, and failed to intervene on her behalf.

6  **ARREST OF PLAINTIFF BAYODE**

7       58.    Olaoluwa Bayode ("Bayode") was also a victim of the skirmish line.

8  He was arrested by LAPD Defendants Rockett and Chiu while he was leaving the

9  party and attempting to disperse into traffic.

10       59.    On information and belief officers with both the LAPD and USC

11  DPS, acting in concert with each other, issued contradictory instructions of

12  dispersal while simultaneously blocking the street with the skirmish line and

13  preventing students from leaving. Bayode was one such student, anxiously

14  following the crowd looking for an exit, when he discovered he had nowhere to go.

15  He put his hands in the air, facing the skirmish line.

16       60.    Defendants Rockett and Chiu were, inexplicably, incensed and

17  arrested Bayode.

18       61.    Four to seven Defendant Officers, including Defendants Rockett and

19  Chiu, slammed Bayode forcibly against a nearby fence and pummeled him to the

20  ground.

21       62.    At no time was Bayode's demeanor threatening, abrasive,

22  provocative, or anything other than confused and harmless. As such, Plaintiff

23  Bayode's arrest lacked probable cause, and the force used was excessive and

24  unreasonable.

25       63.    His arrest also took place in full view of the LAPD and USC DPS

26  officer skirmish line. These unnamed LAPD officers and USC DPS Doe

27  Defendants watched on as their fellow officers violated Bayode's constitutional

28  rights.

SECOND AMENDED COMPLAINT

64.     The arresting officers' force was so imposing that it injured and severely bruised Bayode's shoulder and bloodied his face, back and knee. Bayode was then taken to a detention center. As a result of LAPD's excessive force, Bayode suffered abrasions to his face, knee, and shoulder, all of which resulted in permanent scarring.

**ARREST OF PLAINTIFF RUMBO**

65.     Plaintiff Debbie Rumbo ("Rumbo") was yet another victim of the intimidating skirmish line of LAPD and USC DPS Doe Defendant officers. She also attempted to follow the contradictory directions and disperse the party, but was prevented from doing so as the pathway to her car was blocked by police.

66.     An unknown Defendant Officer threatened to punch Plaintiff Rumbo in the face. Immediately thereafter, another unknown Defendant Officer forcefully used his baton and pressed Rumbo against a fence where Defendant Officers Barrientos and Marx grabbed Plaintiff Rumbo's wrist and arrested her.

67.     Rumbo did not resist the arrest, and with a metal baton and metal fence on either side of her, she could not resist arrest. Police transferred Plaintiff Rumbo to a police vehicle and took her to a detention center.

**ARREST OF PLAINTIFF SNEED**

68.     Plaintiff Jason Sneed ("Sneed") witnessed the detention of Howard and forceful arrests of his classmates Bayode and Sutton.

69.     Sneed attempted to leave the scene but his car was blocked by the police setting up a skirmish line, and by LAPD SWAT personnel.

70.     At this point, Plaintiff Sneed attempted to coordinate his other classmates caught up in the chaotic scene in an effort to calm them down and assist the other students with leaving the area and complying with the conflicting demands of LAPD and USC DPS Doe Defendant Officers. The officers issued directives to a group of students, including Sneed, requiring them to walk down Hoover. Sneed complied, and assisted other student with leaving the scene.

**SECOND AMENDED COMPLAINT**

71.     When Sneed approached Hoover and Adam, LAPD officers lit him up with flashlights and the police helicopter overhead lit him up with the spot light. He was detained and then placed under arrest. LAPD officers told him they "**singled him out because he was directing the group**" and they "**thought it was cute** he was trying to do it for the girls."

72.     Sneed was cited for an infraction and released.

## THE AFTERMATH

73.     USC DPS DOE DEFENDANTS 2-10, wearing guns and in full uniform and badge, collaborated with the LAPD and LAPD Individual Defendants, to organize and participate jointly and actively with each other in an excessive and unreasonable showing of police force totaling approximately seventy-nine policing units from the two law enforcement agencies for the purpose of quelling a simple noise complaint at a peaceful African-American Student party.

74.     **LAPD Defendants and USC DPS DOE DEFENDANTS did not arrest a single attendee of the louder, unregistered, unsupervised, predominantly Caucasian 1223 party, which was directly across the street**.

75.     Upon information and belief, there were no reports of violent or riotous activity given to the LAPD or USC DPS at any time prior. **None of the units were used to disband the predominantly Caucasian, unregistered party across the street**, and all units focused on forcefully breaking up the registered and screened predominantly African-American and minority party at 1222.

76.     Students could not escape the scene due to police skirmish lines and blockades set up by LAPD and USC DPS DOE DEFENDANTS in a coordinated effort at intimidating Plaintiffs and their peers attempting to peacefully disburse.

77.     Some of the Plaintiffs were arrested on the block of 27th Street and Hoover Street in Los Angeles, California, which is .4 miles south of the 1222 party on 23rd Street and Hoover Street.  These students, who were blocks away from the scene of the party, were arrested on the trumped up charge of "failure to disperse."

78.     All charges were eventually dropped by the City Attorney's Office. The Los Angeles County District Attorney's Office refused to file charges outright.

79.     Immediately after the wrongful arrests Plaintiffs, and each of them, were beginning their final examinations at school while being forced to defend themselves against wrongful arrests and charges of criminal conduct. They were misled by Defendant USC who issued a false promise that it would provide academic accommodations and psychological counseling to Plaintiffs. Defendant USC to this day has failed to keep its promise, and upon information and belief, never intended to in the first place.

**GOVERNMENT CLAIM REQUIREMENT**

80.     Plaintiffs, and each of them, timely complied with the Government Claim presentation requirement pursuant to Cal. Gov. Code. § 911.2 by filing government claims against the entity defendant on September 27, 2013. On April 15, 2014, all Plaintiffs' government claims were denied.

**V.**

**FIRST CAUSE OF ACTION**

**VIOLATION OF CIVIL RIGHTS: UNREASONABLE AND EXCESSIVE USE OF FORCE (42 U.S.C. § 1983)**

***(As Against LAPD INDIVIDUAL DEFENDANTS, USC DPS DOE DEFENDANTS 2-10)***

81.     Plaintiffs, and each of them, repeat and re-allege each and every allegation of the paragraphs above as though fully set forth herein.

82.     This action is brought pursuant to 42 U.S.C. §1983, and the Fourth and Fourteenth Amendments of the United States Constitution.

83.     USC DPS DOE DEFENDANTS are gun carrying badge wearing law enforcement officers employed by Defendant USC, who train at the LAPD Police Academy, and are charged by law with the primary policing responsibilities for USC's campus and the areas immediately surrounding the campus by virtue a

"Memorandum of Understanding" with the LAPD, which, upon information and belief, entrusts traditional state police powers of arrest, investigation, and crime patrol and prevention to the USC DPS.

84.    Upon information and belief, pursuant to the Memorandum of Understanding, the USC DPS **and not the LAPD** has the authority to conduct crime prevention activities, investigations and custodial arrests on the USC Campus, and in the area immediately surrounding the USC campus.

85.    Upon further information and belief, the LAPD would be required to notify and coordinate with the USC DPS if they were to enter onto the USC campus or the area immediately surrounding the campus to conduct policing activities thereon. The scene of the incident, 1222 W. 23rd Street, and the area surrounding the house at that location, is immediately adjacent to the USC campus and, upon information and belief, falls within the patrol area of the USC DPS.

86.    Therefore, on the night of the incident, May 3-4, 2013, USC DPS DOE DEFENDANTS 2-10 were acting within the course and scope of their employment and under color of state law as officers entrusted with these state powers, and were exercising said powers under the Memorandum of Understanding in direct coordination with the LAPD, and within their traditional area of patrol, when they engaged in the conduct complained of herein.

87.    Likewise, LAPD Individual Defendants, and each of them, were law enforcement officers acting within the course and scope of their employment as such, and empowered with traditional State police powers, when they engaged in the wrongful conduct as alleged herein.

88.    LAPD Individual Defendants, and each of them, were law enforcement officers acting within the course and scope of their employment as such, and empowered with traditional State police powers, when they engaged in the wrongful conduct as alleged herein

89.    On and before May 4, 2013, Plaintiffs each possessed the right,

guaranteed by the Fourth and Fourteenth Amendments of the United States Constitution, to be free from unreasonable searches seizures in the form of excessive force by police officers acting under the color of law and from illegal and warrantless restrictions of their freedom.

90.     The conduct of USC DPS DOE DEFENDANTS 2-10 and LAPD Individual Defendants violated these civil rights, by engaging in the conduct described herein, to wit:

a.     Upon information and belief, USC DPS DOE DEFENDANTS actually requested or organized the showing of force, or otherwise exaggerating the need for an unreasonable showing of force, during the incident in question, on May 3-4, 2013.

b.     USC DPS DOE DEFENDANTS were present on the scene of the incident in full uniform, wearing guns and other weapons of lethal and less-than-lethal force, and **participated directly and aided the LAPD in the unconstitutional abuses and excessive uses of force** by coordinating intimidation tactics used to control and disburse the crowd of minority students present, including Plaintiffs, and by intentionally targeting minority students including Plaintiffs, for arrest and disbursement, all without reasonable suspicion or probable cause that they were committing any crime.

c.     USC DPS DOE DEFENDANTS created the "skirmish line" and stood shoulder to shoulder with LAPD officers in a concerted effort to confuse and intimidate the disbursing students, including Plaintiffs herein, and push them back toward the officers who were waiting to engage them and arrest them.

d.     LAPD Individual Defendants, and each of them, shoved,

18

seized, wrestled, grabbed, stood on, and otherwise forcefully seized and arrested Plaintiffs without probable cause.

e.   Plaintiffs' illegal arrests took place in front of each and every one of USC DPS DOE DEFENDANTS 2-10, who, rather than help Plaintiffs and stop the civil rights abuses, continued in their aggressive and authoritative participation with the LAPD Individual Defendants in a joint effort to secure Plaintiffs' unlawful arrests.

91.   At the time of the civil rights abuses as Plaintiffs describe herein, Plaintiffs had not assaulted any Defendant, had committed no crime and were not suspects of any criminal activity whatsoever; Plaintiffs were unarmed, compliant, and helpless, and the attacks upon each Plaintiff were unjustified and unreasonable under the circumstances and constituted an excessive use of force.  The attacks violated Plaintiffs' rights under the laws and Constitution of the United States.

92.   Defendants and each of them, subjected Plaintiffs to the aforementioned deprivations by either actual malice, deliberate indifference or a reckless disregard for Plaintiffs' rights under the U.S. Constitution.

93.   LAPD Individual Defendants and DOE DEFENDANTS 2-10 acted at all times herein knowing full well that the established practices, customs, procedures, and policies of Defendant City of Los Angeles, through the policies of the LAPD, and Defendant USC would allow a cover-up and allow the continued use of illegal force in violation of the Fourth Amendment of the Constitution of the United States and would permit said officers to justify the assaults on Plaintiffs by falsely reporting that any injuries to Plaintiffs were cause by Plaintiffs' resisting arrest, "obstructing" a police officer or by Plaintiffs' own misconduct.  Said false reporting and ratification of LAPD Individual Defendants' misconduct and the conduct of USC DPS DOE DEFENDANTS 2-10 was made with the intent to assure that Plaintiffs, and others similarly situated, would be dissuaded from

1  petitioning their grievances against the Defendants City of Los Angeles or USC for

2  such misconduct so that such misconduct could, instead, prevail and subjugate its

3  citizens and students.

4       94.    As a direct and proximate result of the aforementioned acts of LAPD

5  Individual Defendants and USC DPS DOE DEFENDANTS 2-10 and each of

6  them, Plaintiffs suffered injuries to their person, and to their psyche, some of

7  which have taken on a permanence in the form of on-going physical, psychological

8  and emotional injuries.  Plaintiffs may continue to require and need medical care,

9  treatment, medication, therapy, and/or other medical services as a result of the

10  injuries they received at the hands of LAPD Individual Defendants and USC DPS

11  DOE DEFENDANTS 2-10 and each of them. As a further direct and proximate

12  result of said injuries and Defendants' conduct alleged herein, Plaintiffs, and each

13  of them, suffered an inability to perform to their fullest potential as students during

14  their academic finals, therefore hindering their future potential resulting in loss of

15  earning capacity in amounts to be proven at trial.

16       95.    The acts of LAPD Individual Defendants and USC DPS DOE

17  DEFENDANTS 2-10 were willful, wanton, malicious, and oppressive thereby

18  justifying the awarding of exemplary and punitive damages as to said individual

19  defendants in an amount to deter such misconduct in the future.

20  **VI.**

21  **<u>SECOND CAUSE OF ACTION</u>**

22  **VIOLATION OF CIVIL RIGHTS: FALSE ARREST AND MALICIOUS**

23  **PROSECUTION (42 U.S.C. § 1983)**

24  ***(As Against LAPD INDIVIDUAL DEFENDANTS)***

25       96.    Plaintiffs repeat and re-allege each and every allegation of the

26  paragraphs above as though fully set forth herein.

27       97.    The false Arrest Report prepared by LAPD Individual Defendants was

28  prepared with the intent to file said reports with the County of Los Angeles District

Attorney and City of Los Angeles Attorney's Offices to thus subject Plaintiffs to the filing and commencement of a groundless prosecution to subject Plaintiffs to fine, incarceration, a criminal record and costs and charges associated therewith.

98.     The arrests of each Plaintiff lacked probable cause, a fact known to LAPD Individual Defendants, who therefore filed said report with the knowledge that it was false and with the purpose of punishing Plaintiffs for Defendants' own imagined slight or for some other baseless and warped reason. These false reports were filed with the knowledge and ratification of LAPD DOE Supervisors 5-10.

99.     As a direct and proximate result of LAPD Individual Defendants' reporting of such trumped-up charges, Plaintiffs, and each of them, were forced to endure the probability of being prosecuted for crimes they did not commit for over one month while the City Attorney delayed the decision to file charges. As a further result, Plaintiffs suffered emotional harm and harm to their reputations, and suffered an inability to perform to their fullest potential as students during their academic finals, therefore hindering their future potential resulting in loss of earning capacity, all in amounts to be proven at trial.

100.    The acts and omissions constituting this cause of action were purposeful, malicious, and reckless and wanton so as to justify the imposition of punitive damages on these individual Defendants in their respective individual capacity in an amount to deter such misconduct in the future.

## VII.

## THIRD CAUSE OF ACTION

## VIOLATION OF CIVIL RIGHTS: FAILURE TO INTERVENE (42 U.S.C. § 1983)

### *(As Against USC DPS DOE DEFENDANTS 2-10)*

101.    Plaintiffs repeat and re-allege each and every allegation of the paragraphs above as though fully set forth herein.

102.    At all times relevant herein during all the acts, conduct, failures and

21

omissions relevant to the abuse, mistreatment, injury and prosecution of Plaintiffs, and each of them, USC DPS DOE DEFENDANTS 2-10 were present at said times and places as alleged and/or were aware of Plaintiffs' plight at the hands of their co-defendants and were charged with the Constitutional duty to protect Plaintiffs from such abuses and misconduct.

103.   Each said Doe Defendant was also charged with the duty to not knowingly nor with wanton disregard, allow, permit or fail to intervene in the acts of excessive, unreasonable, unjustified or unlawful use of force by another police officer, and the unjustified, unwarranted, illegal and false charges to which Plaintiffs were subjected to.

104.   On said dates, times and locations as alleged above, each said Defendant was in the position and authority to lawfully intervene in and prevent the unjustified and unwarranted conduct toward Plaintiffs which ultimately led to their injuries and/or damages.

105.   On said dates, times and locations as alleged above, each said Defendant had ample and reasonably sufficient time and opportunity to intervene and prevent the wrongful conduct of the other officers, to prevent the injuries and damages and to timely intercede so Plaintiffs would not be mistreated and abused and were compelled to do so as Peace Officers, acting under Memorandum of Understanding from the LAPD which granted them police powers under the laws of the State of California and under the Constitution of the United States of America.

106.   On said dates, times and locations as alleged above, in deliberate indifference to the life, rights, safety and welfare of Plaintiffs, each said Defendant intentionally and with deliberate indifference to Plaintiffs' civil rights, refrained from intervening in the acts leading to their injuries and thereafter refrained from intervening to so that Plaintiffs would not be falsely arrested and falsely charged with and prosecuted for crimes they never committed.

SECOND AMENDED COMPLAINT

107.   Plaintiffs' illegal arrests took place in front of each and every one of these USC DPS DOE DEFENDANTS 2-10, who stood by idly and watched their fellow officers engage in conduct which deprived Plaintiffs of their rights; each of them failing to intervene despite owing a legal duty to Plaintiffs to do so.

108.   **At least one USC DPS DOE DEFENDANT stood within ten to twenty feet of the forceful arrests of Plaintiffs Wang, Jackson and Vinson**, watched a LAPD officer stand on Vinson's back and heard her cry out in pain, and did absolutely nothing to intervene on her behalf. Instead, this DOE DEFENDANT stood "guard" with his hand on his firearm.

109.   Several days after the incident, while being interviewed after a Town Hall meeting which was held to address the anger over Plaintiffs' arrests, Defendant CHIEF THOMAS, Chief of USC DPS and an agent of Defendant USC, had the following to say: "**I want our officers to take the lead in these situations, where our students are dealing with the police – *intervene on their behalf*. I was very disappointed at what I saw from our officers.**"

110.   As the foregoing illustrates, USC DPS DOE DEFENDANTS, by USC's own admission, failed to intervene to stop the violations of Plaintiffs' civil rights which occurred directly in front of these Defendant Officers.

111.   As a result, Plaintiffs, and each of them, were unjustifiably, purposely, recklessly and wantonly, and with deliberate indifference, exposed to the injuries and damages and harm by said Defendants as alleged in the First and Second Causes of action in violation of their rights under the Fourth, and Fourteenth Amendments of the Constitution of the United States of America.

112.   The acts and omissions constituting this cause of action were purposeful, malicious, and reckless and wanton so as to justify the imposition of punitive damages on these individual Defendants in their respective individual capacity in an amount to deter such misconduct in the future.

**VIII.**

23

1

2

3

4

## **FOURTH CAUSE OF ACTION**

### *MONELL* **Claim under 42 U.S.C. § 1983**

### *(As Against CITY OF LOS ANGELES, USC, and CHIEF JOHN THOMAS in his Individual and Official Capacity)*

5

6

113.   Except as to the punitive damages allegations, Plaintiffs repeat and re-allege each and every allegation above as though fully set forth herein.

7

8

114.   This action is brought pursuant to 42 U.S.C. §1983 for violation of Plaintiffs' rights under the Fourth and Fourteenth Amendments.

9

10

11

12

13

115.   In the months and years leading up to May 3-4, 2013, Defendants USC and City of Los Angeles, by and through their respective police units, the USC DPS and LAPD, had in place a long standing practice and custom of subjecting African-American USC students to unequal and excessively forceful police scrutiny and interference.

14

15

16

17

18

19

116.   This is no more apparent than in this case, where, not one month prior to the events in question, on April 13, 2013, LAPD showed up in riot gear to a peaceful non-violent and law abiding party of African-American USC Students. A LAPD Officer, Defendant Carlyle, stated that the LAPD's aggressive and excessive responses to African-American parties are prompted by Defendant USC, by and through its DPS

20

21

22

23

117.   The April 13 incident continued an unfortunate pattern of USC prompting and participating in, and LAPD using, excessive and unreasonable showing of police force and police interference in the lawful and peaceful activities of USC's African-American student population.

24

25

26

27

28

118.   Defendants USC and LAPD had actual knowledge of this pattern and practice of marginalizing and stigmatizing the African-American students through such police interference, a fact which is confirmed by USC's setting up a "Town Hall" meeting at the USC campus on May 7, 2013, to discuss with the Public and the students the very issue of racially unequal treatment of black students by the

SECOND AMENDED COMPLAINT

USC DPS and LAPD on and around the USC campus.

119.   Despite this actual awareness, Defendants LAPD and USC as well as policy-maker Defendant CHIEF THOMAS failed entirely to take appropriate or timely corrective action or employ policies to change the longstanding practice and custom of police violating African-American students' civil rights; and Defendants' failures when coupled with the years of actual knowledge and awareness of the said longstanding custom and practice amounts to deliberate indifference to the rights of these Plaintiffs under the Fourth and Fourteenth Amendments to the United States Constitution.

120.   Private corporations, such as Defendant USC, like municipal entities may be held liable under *Monell* for having a longstanding practice and custom of civil rights abuses perpetrated by their employees. Said practice and custom became the moving force behind USC DPS DOE DEFENDANTS 2-10's conduct alleged herein.

121.   Upon information and belief, Defendant CHIEF THOMAS had, at all times relevant hereto, the final policy-making authority and was charged the responsibility of setting the guidelines, procedures, policies and practices by which USC DPS officers, such as DOE DEFENDANTS 2-10 herein, were to be trained and according to which their conduct on the job would be measured. Defendant CHIEF THOMAS also was charged with the responsibility and final policy-making authority of ensuring that his USC DPS officers were not violating the civil rights of civilians, and USC Students, such as Plaintiffs.

122.   Upon information and belief, in the years and months prior to May 4, 2013, Defendant CHIEF THOMAS received numerous complaints of excessive force and unreasonable police interference from the black student community at the hands of USC DPS officers. Defendant CHIEF THOMAS failed entirely to take reasonable and timely corrective measures, and/or through his authority as Chief employ corrective policies, to ensure that such abuses would stop occurring

SECOND AMENDED COMPLAINT

at the hands of the employees he supervised and was responsible for.

123.   The acts or omissions of policy-maker Defendant CHIEF THOMAS, in allowing such a practice and custom of civil rights violations to permeate USC's DPS, further helped entrench the longstanding practice and custom of USC DPS officers, such as DOE DEFENDANTS 2-10, violating the civil rights of African-American students, which in turn became a driving force behind the violations of Plaintiffs' constitutional rights in this case.

124.   At all times relevant herein, Defendant City of Los Angeles' Police Department, upon information and belief, employed organized, unlawful and illegal customs and practices of excessive force and illegal searches and seizures, false arrests which lacked probable cause, falsification of evidence, filing of false police reports in violation of P.C. §118.1, and the commission of perjury in carrying out their mandate.  Said misconduct was encouraged, tolerated and condoned by Defendant City of Los Angeles.

125.   On the date of Plaintiffs' arrests indicated above LAPD Individual Defendants, acting within the course and scope of their duties as peace officers of the Los Angeles Police Department, deprived Plaintiffs of  their rights to be free from unreasonable seizures and unlawful arrests as delineated herein above, and thereafter LAPD Individual Defendants, in violation of Plaintiff's due process rights, proceeded to falsify evidence, submit a false police report in the way of the arrest and use of force had come about in an attempt to ensure that Plaintiffs, and each of them, would be found guilty of the false charges.

126.   At the time of these constitutional violations by said defendant officers, Defendant City of Los Angeles' Police Department, the LAPD, had in place, and had ratified, policies, procedures, customs and practices which permitted and encouraged their police officers to unjustifiably, unreasonably and in violation of the Fourth and Fourteenth Amendments, to unlawfully arrest persons without probable cause.

127.   Said policies, procedures, customs and practices also called for the Defendant City of Los Angeles and its Police Department not to discipline, prosecute, or objectively and/or independently investigate or in any other way, deal with or respond to known incidents and complaints of false arrests, falsification of evidence, the preparation of false police reports to justify such wrongful conduct, to cover-up and conceal such wrongful conduct by officers of the LAPD, and for Defendant City of Los Angeles to fail to objectively and/or independently investigate or in any other way, deal with or respond to the related claims and lawsuits made as a result of such false arrests and related misconduct.

128.   Defendant City of Los Angeles was aware of and was deliberately indifferent to a pervasive and widespread pattern and practice with the LAPD of concealing known instances of evidence planting, evidence tampering, perjury, falsified police reports, witness coercion, excessive force, on-duty criminal acts and on-duty acts of moral turpitude. Despite said knowledge, said Defendant City of Los Angeles failed to take any reasonable measures to correct this pattern and practice and as a result Defendant City of Los Angeles has been deliberately indifferent to the civil rights violations which resulted, including those which are described in the present claim.

129.   Said policies, procedures, customs and practices called for and led to the refusal of said Defendant City of Los Angeles to investigate complaints of previous incidents of false and unlawful arrests, the filing of false police reports to conceal such misconduct, the falsification evidence and perjury and, instead, ***officially claim that such incidents were justified and proper***.

130.   Such is also evidenced by the City's handling of the criminal matter underlying this lawsuit.

131.   The City Attorney failed to officially drop the charges or to arraign the six Plaintiffs until June 26, 2013, which far exceeds the requisite 48 to 72 hour filing period for criminal charges after an arrest. Cal. Penal Code §§ 825, 849.

132.   When the Plaintiffs appeared in Court on May 30, 2013 as scheduled, they were informed that the City Attorney had not filed any charges.

133.   In confirmation, Plaintiffs' Attorney Fred Dorton received Court documents stamped "No Charges Filed."

134.   Despite this Court notice **and despite the City Attorney's Office having access to video evidence which proved Plaintiffs were arrested without probable cause**, Senior Media Advisor for the City Attorney's Office Sandy Cooney told NBC4 News that the case was still pending and the City Attorney **had not dropped the charges against the six Plaintiffs**.

135.   On June 26, 2013, via a written statement, Los Angeles City Attorney Carmen Trutanich stated that the City Attorney's Office declined to file charges against the six Plaintiffs due to "lack of sufficient evidence and no reasonable likelihood of conviction."

136.   This treatment of Plaintiffs condones the force used, the excessive response, the abridging of these students' privileges, immunities, and right to due process under the law. It authorizes the disparate treatment of these students on the basis of their race.

137.   Said policies, procedures, customs and practices called for said Defendants, by means of inaction and cover-up, to encourage an atmosphere of lawlessness within the LAPD and to encourage their police officers to believe that improper arrest of residents of the City of Los Angeles, or persons present therein, such as Plaintiffs in this case, the planting of evidence, the submission of false police reports, and the commission of perjury was permissible and to believe that unlawful acts of falsification of evidence and perjury would be overlooked without discipline or other official ramifications.

138.   Said policies, procedures, customs and practices of said Defendant City of Los Angeles has evidenced a deliberate indifference to the violations of the constitutional rights of Plaintiffs in this case.  This indifference was manifested by

the failure to change, correct, revoke, or rescind said policies, procedures, customs and practices in light of prior knowledge by said Defendant and its subordinate policymakers of indistinguishably similar incidents of unjustified and unreasonable and unlawful arrests, falsification of evidence, evidence tampering, submission of false police reports and perjury.

139.   Deliberate indifference to the civil rights of victims of Defendant City of Los Angeles' Police Department's unlawful arrests, falsified evidence, false and misleading police reports and false and perjurious testimony was also evidenced by said Defendants by their ignoring of the history and pattern of prior civil lawsuits alleging civil rights violations, similar to those alleged herein, arising from such misconduct and the related payment of judgments to such individuals.

140.   Deliberate indifference is also evidenced by an absence of or by maintenance of an inadequate system of tort claims tracking, firearms discharges tracking, use-of-force tracking, and by maintaining an inadequate system of officer discipline and independent and objective investigation by the Defendant City of Los Angeles and the LAPD which failed to identify and investigate instances of false and unlawful arrests, falsification of evidence, submission of false police reports and perjury.

141.   Other systemic deficiencies of said Defendant which indicated, and continue to indicate, a deliberate indifference to the violations of the civil rights by the officers of the LAPD include:

        a.   Preparation of investigative reports designed to vindicate and/or justify false and unlawful arrests;

        b.   Preparation of investigative reports which uncritically rely solely on the word of LAPD officers involved in unlawful arrests or in the planting of evidence and which systematically fail to credit testimony by non-officer witnesses;

        c.   Preparation of investigative reports which omit factual

information and physical evidence which contradicts the accounts of the officers involved;

d. Issuance of public statements exonerating officers involved in such incidents prior to the completion of investigations of wrongful arrests;

e. Failure to maintain centralized department-wide system for the tracking and monitoring tort claims and lawsuits alleging false arrests, planting of evidence, perjury, abuse of authority, and race-based misconduct by individual officers so as to identify those officers who engage in a pattern of abuse of police authority and police misconduct;

142.   The foregoing acts, omissions, and systemic deficiencies are policies and customs of said Defendant City of Los Angeles and such caused, permitted and/or allowed under official sanction, LAPD Individual Defendants to be unaware of, or to intentionally overlook and ignore, the rules and laws governing the use of force, the probable cause requirements for arrests, the falsification of evidence or the tampering with evidence, and the submission of false police reports.

143.   The foregoing acts, omissions, and systemic deficiencies are policies and customs of said Defendant City of Los Angeles and such caused, permitted and/or allowed under official sanction said LAPD Individual Defendants to believe that arrests are entirely within the discretion of the officer and that improper and unlawful arrests, evidence falsification, filing of false and misleading police reports, would not be objectively, thoroughly and/or properly investigated, all with the foreseeable result that  LAPD Individual Defendants would make false and unlawful arrests, and falsify evidence, submit false and misleading police reports, and commit perjury, and thereby violate the civil rights of the citizens of this state with whom said officers would come into contact with.

144.   As a result of the aforementioned acts, omissions, systematic

SECOND AMENDED COMPLAINT

deficiencies, policies, procedures, customs and practices, LAPD Individual Defendants, as more specifically alleged above, unlawfully arrested Plaintiffs, assaulted and battered them, and developed and implemented a plan to falsely accuse them of the criminal violations alleged in an attempt to secure their prosecution thereof, and to inflict punishment for a perceived slight or some other baseless, imaginings of Defendants.

145.   As a direct and proximate result of the aforementioned acts of Defendants City of Los Angeles, USC, and CHIEF THOMAS and the practices, policies, customs and procedures alleged, Plaintiffs suffered the injuries alleged in this Complaint, all to their damages in a sum according to proof at trial.

## IX.

## FIFTH CAUSE OF ACTION

## CIVIL RIGHTS – 42 USC § 1983 – RACIAL DISCRIMINATION AND DEPRIVATION OF EQUAL PROTECTION

### (As Against LAPD INDIVIDUAL DEFENDANTS, CHIEF JOHN THOMAS in his individual and official capacity, and USC DPS DOE DEFENDANTS 2-10)

146.   Plaintiffs repeat and re-allege each and every allegation of the paragraphs above as though fully set forth herein.

147.   On information and belief, USC DPS DOE DEFENDANTS 2-10, inclusive, were employee officers, supervisors and/or policy makers for the USC DPS who were active participants along with the LAPD in the actions complained of herein, or otherwise caused, set in motion, ordered, or whose actions were a substantial factor in causing the constitutional violations perpetrated by individual officers against Plaintiffs, and each of them, as alleged herein.

148.   In doing each and all of the acts alleged in this Complaint, each said Defendant was acting under color of law.

149.   On May 4, 2013, LAPD and USC DPS DOE DEFENDANT officers did not use force against the attendees of the predominantly Caucasian party at

31

1223 across the street from the predominantly minority and black party. In fact, they did not even require the occupants of 1223 to shut down the party and disperse. The instructions relayed to the 1223 predominantly Caucasian party as relayed by the host of that party was to "stay safe inside the house."

150.   **In direct juxtaposition to the treatment of Caucasian students at an unregistered, much louder, alcohol-serving, and unscreened party at 1223, detailed above, the LAPD officers forced the 1222 predominantly African American students out onto the streets after using excessive force, thrust them into traffic, and gave them the blatantly contradictory instructions of dispersal while preventing them from dispersing**.

151.   Prior to the incident, USC DPS had actual knowledge that a predominately African American and minority student party would be taking place at that location on the night of May 3, 2014. The hosts of that party registered the party with USC DPS.

152.   Therefore, when USC DPS organized or otherwise exaggerated the need for excessive police response as alleged herein, **they did so with the knowledge that they were responding to a predominately African American student party.**

153.   Upon arrival at the scene of the incident, the USC DPS Doe Defendants purposefully targeted Plaintiffs as African Americans and minorities for arrest and police interference, while allowing a party similar in all ways except race and national origin directly across the street to continue un-interfered.

154.   As one Caucasian student, Sarah Tither-Kaplan, a host of the predominately white party and percipient witness stated at a town hall meeting hosted by Defendant USC days after the incident, "**These students (black students) were not treated with respect. My house (white students) was treated with respect. The only difference between the two parties was that racial component and if you're going to deny that, then I'm sorry, I'm just not**

SECOND AMENDED COMPLAINT

1   going to stand for it.**"

2       155.   Another Caucasian USC student, Will O'Meara, who also witnessed

3   the incident as an attendee of the Caucasian party across the street, stated in an

4   interview days after the incident, "**They (the police) told us to stay inside, and to**

5   **be safe, while they took care of 'the issue' across the street. The fact that we**

6   **were basically allowed to continue while the black students across the street**

7   **suffered was, a pretty gross injustice.**".

8       156.   USC DPS, in active coordination with the LAPD, has a history of

9   showing excessive police force in response to minority students' parties at or

10  immediately around the USC campus. Upon information and belief, Plaintiffs

11  allege that the LAPD has responded to at least five minority student parties on or

12  near the USC campus, and within USC DPS patrol territory, with an excessive

13  showing of force in the 2012-2013 school year alone.

14      157.   For example, in April 2013, nine (9) LAPD squad cars and officers in

15  riot gear arrived at a house party hosted by African-American USC students two

16  (2) blocks from the USC campus. The LAPD indicated they were responding to a

17  "noise complaint" despite the very heavy police presence. Defendant Carlyle

18  commented on the exaggerated police presence to address the alleged noise

19  complaint by indicating that, **"They [USC DPS] call for us, and they [USC DPS]**

20  **give us a different story than what's actually happening."**

21      158.   In this interview, Defendant Carlyle substantiates both: (a) the fact

22  that Defendant USC, by and through the USC DPS, instigates, organizes, or

23  otherwise prompts exaggerated police interference with minority students at USC;

24  and (b) the complete lack of concern of the LAPD for establishing reasonable

25  suspicion and probable cause before calculating a response.

26      159.   Officer Carlyle therefore, admits complete neglect for Constitutional

27  standards and protections by the LAPD who respond to every situation involving

28  African-American and minority party-goers in the same forceful, imposing, and

excessive manner **solely because it was at the beck and call of USC**.

160.   Officer Carlyle's response is given in the context of a question alluding to racial disparity in LAPD's response. In this context, Officer Carlyle's response is inaccurate and a misrepresentation of the true circumstances. This becomes clear when the student specifically asks whether Officer Carlyle has responded to a party which is predominantly Caucasian, with the same level of force and high unit numbers, and Officer Carlyle responds, "I'll be honest with you; actually, I have in 2008."

161.   The 2008 predominantly Caucasian party is a testament to the disparate treatment that has been the hallmark of the LAPD and USC DPS Officers' treatment of African-American and minority students at USC in comparison to their fellow Caucasian students. At the 2008 incident, the LAPD officers arrived on the scene of a predominantly Caucasian USC party where students were engaging in violent and riotous activity. Students were shouting obscenities at officers, ignoring officers' orders, jeering at the LAPD, and throwing bottles and cans at the officers; Students were standing on top of police cruisers raucously shouting at officers and inciting the crowd; one student smoked a marijuana cigarette directly in front of the officers, while taunting the officers intermittently; another group of students began to physically fight one another, while students collectively shouted, "Fuck you!" to police officers.

162.   The 2008 riot was an extremely volatile situation, endangering the safety of bystanders and officers. **Police allowed this activity to continue for a substantial amount of time before requesting the students to cease**.

163.   Notably, the rioting and belligerent students in 2008 were predominately white. In dramatic contrast, Plaintiffs here were not rioting; they were attendees of a properly registered party, and at all times were compliant, non-belligerent, law abiding and peaceful. Yet they received similar if not worse treatment from the LAPD and USC DPS, and more egregiously, suffered the pain,

humiliation, and psychological and emotional trauma of being wrongfully arrested and charged with a crime.

164.   **The message at USC is painfully simple: smoke marijuana in front of, and make profane gestures to police, and be white, and you will be left alone. Be law-abiding but loud, and be black, and you will be arrested**.

165.   Furthermore, Upon information and belief, in the years and months prior to May 4, 2013, Defendant CHIEF THOMAS received numerous complaints of excessive force and unreasonable police interference from the black student community at the hands of USC DPS officers. Defendant CHIEF THOMAS failed entirely to take reasonable and timely corrective measures, and/or through his authority as Chief employ corrective policies, to ensure that such abuses would stop occurring at the hands of the employees he supervised and was responsible for.

166.   Upon information and belief, Defendant CHIEF THOMAS had, at all times relevant hereto, the final policy-making authority and was charged the responsibility of setting the guidelines, procedures, policies and practices by which USC DPS officers, such as DOE DEFENDANTS 2-10 herein, were to be trained and according to which their conduct on the job would be measured. Defendant CHIEF THOMAS also was charged with the responsibility and final policy-making authority of ensuring that his USC DPS officers were not violating the civil rights of civilians, and USC Students, such as Plaintiffs.

167.   Policy-maker Defendant CHIEF THOMAS' failures, in allowing such a practice and custom of civil rights violations to permeate USC's DPS, further helped entrench the longstanding practice and custom of USC DPS officers, such as DOE DEFENDANTS 2-10, violating the civil rights of African-American students. Such failures when viewed in context of Defendant CHIEF THOMAS' extensive actual knowledge of said practices and customs rises to the level of deliberate indifference to Plaintiffs' constitutional right to equal protection under

SECOND AMENDED COMPLAINT

the law, and acted as the driving force behind USC DPS DOE DEFENDANTS' conduct in this case.

168.   By their conduct herein alleged, Defendants intentionally, willfully and without justification, did deprive Plaintiffs, and each of them, their rights secured to them by the Constitution and laws of the United States, including but not limited to their right to due process and equal protection as provided by the Fourteenth Amendment, in violation of 42 U.S.C § 1983, because of their race.

169.   As alleged herein, **each Defendant knew that predominately African-Americans and minorities attended the party at 1222, while predominately Caucasians attended the party at 1223**.

170.   **Each Defendant further knew that the parties were of similar or identical size in terms of number of attendees**, and demographic in terms of approximate age of attendees (these were student parties).

171.   **Each defendant further knew that the purpose of the request for law enforcement intervention was a "noise complaint" and, upon arrival, each defendant knew that both the 1222 and 1223 parties were playing music and that there was noise emanating from both locations**.

172.   Despite knowledge of these facts, LAPD Individual Defendants and USC DPS DOE DEFENDANTS 2-10, who, upon information and belief, were acting at the behest of, under the direction of, under the order of, or otherwise in coordination with the USC DPS, **intentionally chose the African-American and minority students**, who for all purposes other than their skin color were similarly situated to the Caucasian students across the street, as the targets of the forceful and illegal arrests and seizures, unreasonable uses of force and intimidation, abuses and falsifications of reports as complained of herein.

173.   **Said Defendants' decision to so act was, on its face, discriminatory on the basis of race, as said Defendants treated similarly situated students and party attendees differently on the basis of race, alone**.

174.   Further, said Defendants actions were motivated by a desire to inflict punishment for a perceived slight or some other baseless, imaginings of Defendants, **and as such were not narrowly tailored to achieve a compelling State interest**.

175.   Plaintiffs are first and foremost, human beings, and are citizens of this Country, and at all times relevant to this complaint, enjoyed a right to equal protection under the law; a right afforded them by the Constitution of the United States and the Fourteenth Amendment to the Constitution of the United States.

176.   This right included the right to be free from illegal government action, including official action taken under color of law, which discriminated against Plaintiffs on the basis of their race, and treated them differently than others similarly situated on the basis of the race. Defendants violated this right when engaging in the wrongful conduct alleged herein.

177.   As a direct and proximate result of the aforementioned acts of each said defendant in violating Plaintiffs' Equal Protection Rights, Plaintiffs, and each of them, have suffered the injuries alleged in this Complaint, all to their damages in a sum according to proof at trial.

**X.**

**SIXTH CAUSE OF ACTION**

**STATE LAW – INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**

**(As Against LAPD INDIVIDUAL DEFENDANTS, and USC DPS DOE DEFENDANTS 2-10)**

178.   Plaintiffs repeat and re-allege each and every allegation of the paragraphs above as though fully set forth herein.

179.   The conduct of LAPD Individual Defendants and USC DPS DOE DEFENDANTS 2-10 in unlawfully and unjustifiably assaulting, intimidating, berating and humiliating Plaintiffs for no justifiable reason or cause and the use of

unlawful and excessive force on Plaintiffs knowing that Plaintiffs had done nothing wrong nor illegal in their presence, and thereafter, to punish them for deigning to refuse to be subjected to wrongful and illegal behavior, to proceed to issue false arrest reports, with no probable cause to believe Plaintiffs had committed any crime, was outrageous and exceeded the bounds of conduct usually tolerated in this society.

180.   Additionally, each said defendant chose to use his position of power and authority conferred upon him by law as a Peace Officer in order to affect the injustices upon Plaintiffs as alleged herein, and said conduct was therefore outrageous, and exceeded the bounds of conduct usually tolerated in this society.

181.   Defendant City of Los Angeles is liable under the principles of *respondeat superior* for the aforementioned acts of said LAPD Individual Defendants pursuant to California Government Code Section 815.2.

182.   Defendant USC is liable under common law principles of *respondeat superior* for the aforementioned acts of said DOE DEFENDANTS 2-10, who upon information and belief were USC DPS officers acting within the course and scope of their employment with, and as agents of, Defendant USC when committing said acts.

183.   Defendants, in engaging in the aforementioned conduct, intended to cause Plaintiffs emotional distress and/or acted with reckless disregard of the probability that Plaintiffs would suffer emotional distress.

184.   Defendants' conduct was a substantial factor in causing Plaintiffs, and each of them, to suffer and to continue to suffer from severe emotional distress, mental pain, anguish, embarrassment, humiliation, and psychological disturbance, all in amounts according to proof at trial.

185.   The aforementioned acts of said individual defendants were willful, wanton, malicious, and oppressive, thereby justifying the awarding of exemplary and punitive damages as to said individual Defendants in an amount to deter such

SECOND AMENDED COMPLAINT

misconduct in the future.

## XI.

## <u>SEVENTH CAUSE OF ACTION</u>

## STATE LAW – ASSAULT AND BATTERY

### *(As Against LAPD INDIVIDUAL DEFENDANTS,*
### *and CITY OF LOS ANGELES)*

186.   Plaintiffs repeat and re-allege each and every allegation of the paragraphs above as though fully set forth herein.

187.   In unjustifiably and unlawfully using excessive force to beat and/or forcefully arrest Plaintiffs without probable cause as alleged, defendants and each of them touched Plaintiffs with the intent to harm or offend Plaintiffs, or touched Plaintiffs with a willful disregard of Plaintiffs' rights.

188.   Plaintiffs did not consent to this harmful and offensive touching.

189.   A reasonable person would be harmed and/or in the very least offended if forcefully arrested without having done anything wrong or illegal.

190.   Defendant City of Los Angeles is liable under the principles of *respondeat superior* for the aforementioned acts of said LAPD Individual Defendants pursuant to California Government Code Section 815.2.

191.   As a direct and proximate result of said Defendants' conduct, Plaintiffs, and each of them, suffered serious, permanent, physical, psychological and emotional injuries, which required and will continue to require medical and/or psychological treatment, all to their special damages in an amount according to proof at trial.

192.   The aforementioned acts of said individual defendants were willful, wanton, malicious, and oppressive, thereby justifying the awarding of exemplary and punitive damages as to said individual Defendants in an amount to deter such misconduct in the future.

## XII.

39

**EIGHTH CAUSE OF ACTION**

**STATE LAW – ASSAULT**

*(As Against USC DPS DOE DEFENDANTS 2-10, and USC)*

193.   Plaintiffs repeat and re-allege each and every allegation of the paragraphs above as though fully set forth herein.

194.   On the night of the incident, May 3-4, 2013, USC DPS DOE DEFENDANTS 2-10 were acting within the course and scope of their employment as officers entrusted with these state powers, and were exercising said powers under the Memorandum of Understanding in direct coordination with the LAPD, and within their traditional area of patrol, when they engaged in the conduct complained of herein.

195.   Upon information and belief, USC Doe Defendants actually requested or organized the showing of force, or otherwise exaggerating the need for an unreasonable showing of force, during the incident in question, on May 3-4, 2013.

196.   In addition, USC DPS Doe Defendants were actually present on the scene of the incident and **participated directly, and aided the LAPD in the unconstitutional abuses and excessive uses of force** by assisting the LAPD in the intimidation tactics used to control and disburse the crowd of minority students present, including Plaintiffs, and by intentionally targeting minority students including Plaintiffs, for arrest and disbursement, all without reasonable suspicion or probable cause that they were committing any crime.

197.   Over ten USC DPS officers participated in creating the "skirmish line" and stood shoulder to shoulder with LAPD officers in a **concerted effort to confuse and intimidate the disbursing students, including Plaintiffs** herein, and push them back toward the officers who were waiting to engage them and arrest them.

198.   In engaging in the conduct complained of herein, USD DPS DOE DEFENDANTS 2-10 were acting as law enforcement officers, with the authority

40

1   to effect custodial arrest and police interference under color of law, and were so

2   acting in the course and scope of their employment as agents and employees of

3   Defendant USC.

4       199.   In so acting, Defendants unjustifiably and unlawfully used excessive

5   force and intimidation tactics to confuse, belittle, stigmatize and force Plaintiffs to

6   bend to their will, all without probable cause, and with the intent to instill in

7   Plaintiffs the fear of immediate arrest, battery, or beating at the hands of

8   Defendants, or the LAPD individual defendants with whom Defendants were

9   acting in concert.

10       200.   Plaintiffs did not consent to this unreasonable, illegal, and

11   unjustifiable showing of police force.

12       201.   A reasonable person in Plaintiffs' position would have feared an

13   imminent battery, arrest, or otherwise offensive touching at the hands of

14   Defendants if they showed the audacity to refuse to comply with Defendants'

15   unreasonable demands.

16       202.   Defendant USC is liable under common law principles of *respondeat*

17   *superior* for the aforementioned acts of said USC DPS DOE DEFENDANTS 2-10.

18       203.   As a direct and proximate result of said Defendants' conduct,

19   Plaintiffs, and each of them, suffered serious, permanent, physical, psychological

20   and emotional injuries, which required and will continue to require medical and/or

21   psychological treatment, all to their special damages in an amount according to

22   proof at trial.

23       204.   The aforementioned acts of said individual defendants were willful,

24   wanton, malicious, and oppressive, thereby justifying the awarding of exemplary

25   and punitive damages as to said individual Defendants in an amount to deter such

26   misconduct in the future.

27   ## XIII.

28   ## <u>NINTH CAUSE OF ACTION</u>

41

**STATE LAW – RACIAL DISCRIMINATION IN VIOLATION OF THE**

**UNRUH ACT [Cal. Civ. Code §§ 51, 52]**

*(As Against USC)*

205.   Plaintiffs repeat and re-allege each and every allegation of the paragraphs above as though fully set forth herein.

206.   Defendant USC is a for-profit business entity, a prominent commercial force and ongoing business concern in the Los Angeles Community, and therefore is a "business establishment" under the broad definition afforded in the Unruh Act.

207.   The policing services of the USC DPS are a "service" or "accommodation" within the context of the UNRUH Act. Indeed Defendant USC advertises the effectiveness of the USC DPS "services" that they provide on their website to future students and parents of students, touting the USC DPS' effectiveness at keeping the USC community "safe."

208.   Plaintiffs, as students attending USC, and paying for their attendance through money, academic achievement merit, or a combination thereof, were within the group of people whom the "service", or "accommodation", of policing, as offered by Defendant USC by and through the USC DPS, was intended to protect.

209.   **As such, Plaintiffs were entitled to the right to be free from racial discrimination by the USC DPS**.

210.   Defendant USC, by and through the actions of its agents and employees, USC DPS, and specifically USC DPS DOE DEFENDANTS 2-10, inclusive, who upon information and belief were officers, supervisors and/or policy makers for the USC DPS employed by Defendant USC and acting within the scope of their employment on the date of the incident, and who caused, set in motion, ordered, or whose actions otherwise were a substantial factor in causing the constitutional violations perpetrated by individual officers against Plaintiffs, and

42

each of them, as alleged herein, did engage in a deliberate course of conduct **motivated by the desire to specifically target African-American and minority students for forceful and unlawful seizures by the individual officers as alleged herein**.

211.   Such discriminatory actions perpetrated by the USC DPS, and specifically DOE DEFENDANTS 2-10, as alleged in this Complaint, were committed within the course and scope of their employment with Defendant USC, and Defendant USC is therefore vicariously liable for said actions.

212.   Such actions as complained of herein were discriminatory on their face, as USC DPS DOE DEFENDANTS 2-10 targeted Plaintiffs as minority and African American students for unnecessary police interference and arrest, despite full knowledge that similarly situated Caucasian students resided across the street, in violation of the same presumptive violations Plaintiffs were purportedly in violation of (noise complaint).

213.   On information and belief, Defendant USC, by and through its agents USC DPS and DOE DEFENDANTS 2-10 has engaged in an ongoing pattern and practice of discriminating against African-American and minority students on the basis of race; said pattern and practice, which has gone uncorrected by Defendant USC despite knowledge thereof, was a substantial factor contributing to the constitutional violations against Plaintiffs as alleged in this Complaint.

214.   Such disparate treatment of African-American and minority students highlights a longstanding practice of USC DPS purposefully targeting said students for harassment and increased and illegal police scrutiny in their affairs apparently for no other reason than their belonging to a racial minority, in violation of said students' right to equal protection under the laws of the State of California.

215.   At all times relevant to this complaint, Plaintiffs, and each of them, enjoyed the right to be free and equal, regardless of their race, and were entitled to full and equal accommodations, services, advantages, and privileges available to

43

other students at USC. Defendant USC, by and through it agent USC DPS denied Plaintiffs such equality when engaging in the deliberate and discriminatory actions alleged in this Complaint.

216.   The actions of Defendant USC, by and through its agents and employees, USC DPS, and specifically DOE DEFENDANTS 2-10, as alleged herein of deliberately discriminating against African-American and minority students on the basis of their race was a substantial factor in causing the unreasonable, forceful, and discriminatory response to the noise complaint underlying the immediate incident by individual LAPD and USC DPS officers and the unlawful arrests of Plaintiffs, and each of them, in this case.

217.   As a direct and proximate result, Plaintiffs, and each of them, were exposed to the unlawful and abusive arrests alleged herein, and suffered physical and emotional damages, including the emotional harm associated with being identified by Defendant USC as not entitled to the equal protections it affords other students, therefore marginalizing Plaintiffs and reinforcing damaging societal norms and perceptions that Plaintiffs are less worthy as human beings, all contributing to their damages in a sum according to proof at trial.

**XV.**

**TENTH CAUSE OF ACTION**

**STATE LAW – FALSE PROMISE**

***(As Against USC)***

218.   Plaintiffs repeat and re-allege each and every allegation of the paragraphs above as though fully set forth herein.

219.   After their unlawful and excessively forceful arrests, Plaintiffs did not receive any academic assistance from Defendant USC for their imminently pending finals, nor did they receive any psychological counseling from Defendant USC. This is juxtaposed with the Asian students who, just one year prior when they were affected by the shooting death of two Asian classmates, received both

academic and emotional assistance from Defendant USC.

220.   During the May 7, 2013, Town Hall meeting at the USC Campus (which was scheduled to address the problem of excessive police force and intrusion on African-American students at USC), attorney Fred Dorton made the public statement in front of nearly 1,000 people, including Plaintiffs, community leaders and agents from Defendants USC and LAPD, that Plaintiffs were not receiving any academic or emotional assistance from Defendant USC, and informed everyone that Plaintiffs were being forced to contact their professors directly in order to negotiate any kind of academic assistance with preparing for finals, while facing the prospect of erroneous criminal prosecution. The audience gasped aloud.

221.   In response, then Vice President of USC Student Affairs Dr. Michael Jackson told the audience in the packed auditorium, and the Plaintiffs, **that it was indeed unacceptable for the arrested students to have to hunt down their professors to seek academic accommodations** or to arrange their own psychological counseling for the disruption these arrests caused.

222.   **Dr. Jackson promised the following on May 7, 2013:**

    a.   **That USC would provide academic accommodations to Plaintiffs;**

    b.   **USC would act as the intermediary between Plaintiffs and their teachers;**

    c.   **USC would provide psychological counseling to Plaintiffs**.

223.   However, Dr. Jackson, and Defendant USC, never intended to keep those promises. He knew that the statements were untrue, and made them purely to calm the audience and to place Defendant USC in a better light.

224.   For example, the very next day, on May 8, 2013, Assistant Director of Student Support and Advocacy, Lauren Elan Helsper, sent an email to one of Plaintiff Frances Wang's college professors instructing the professor that Plaintiff

Wang, **and not USC**, would be contacting the professor to negotiate directly with the professor her options for academic accommodations.

225.   According to Ms. Helsper's representations in the email, Dr. Jackson himself requested that the email notifying Plaintiff Wang's professor that Wang would be in contact with them be sent, in direct contradiction of the promise he made to Plaintiffs the day earlier at the Town Hall meeting.

226.   At no time after May 7, 2013, was Plaintiff Wang told by USC that accommodations were being made with her professors. Indeed, on May 9, 2013, Plaintiff Wang was still studying for a final examination scheduled that day, while simultaneously dealing with the trauma of defending herself against wrongful criminal charges. This remained so during another final examination scheduled for May 14, 2013, as direct email correspondence between Plaintiff Wang and another professor during that time period prove; Defendant USC and Academic Affairs was not involved.

227.   Another example: on May 9, 2013, Plaintiff Sneed was told directly by a professor that he would not be allowed an extension on his final examination, due the same day. Thus, in addition to the stress and psychological harm of defending himself against wrongful criminal prosecution, Plaintiff Sneed was forced to confront his own professor, only to be told he would not receive any accommodation – again, in direct contrast to the promises made by Defendant USC only two days earlier.

228.   On information and belief, similar emails were sent from the office of Student Support and Advocacy "on behalf" of all Plaintiffs, forcing each and every Plaintiff to contact their professors directly and negotiate with them for accommodations for the impending final examinations.

229.   On May 8, 2013, Defendant USC's agent, Lynette Merriman, lied to Plaintiffs' attorney when, in an email, she wrote: "We are not asking the students to navigate the university or contact professors.  We are doing the work on their

behalf as we do for numerous situations. We just need to hear the request directly from each student."

230.   In fact, the opposite is true. Students and their professors were told by Defendant USC that the students would be responsible for negotiating their own accommodations, as the following excerpt from an email sent by Ms. Helsper to one of Plaintiff Wang's professors, illustrates: (To Plaintiff Wang's BUAD 497 Course Professor): "**Frances will be reaching out to you** to discuss her situation and how to appropriately complete your course for the semester…**If you wish to get in touch with her** in the meantime, please contact her via e-mail: [francesw@usc.edu](mailto:francesw@usc.edu)."

231.   There can be no question that USC's intent by this email was to have the Plaintiffs, and their professors, track each other down and negotiate what, if any, academic accommodations would be provided.

232.   This is in direct contradiction to the promise made by Dr. Jackson to Plaintiffs at the Town Hall meeting on May 7, 2013.

233.   This is also in direct contradiction to the representation made by Defendant USC, through is agent Lynette Merriman, to Plaintiffs' attorney on May 8, 2013.

234.   It is evident in the context of when these contradictory communications are made, that Defendant USC is apt to make false promises when faced with either public criticism (false promise issued by Dr. Jackson at the Town Hall Meeting on May 7, 2013), or the potential threat of legal action or further complaints (false representation made by Ms. Merriman to Plaintiffs' attorney on May 8, 2013); when in actuality Defendant USC never intended to step in and make accommodations on Plaintiff's behalf, or, as Lynne Merriman put it, "(do) the work on (the students') behalf."

235.   **As such, upon information and belief, these promises were made for the sole purpose of appeasing public and private criticism of USC, and**

1    **were made in an effort to induce Plaintiffs into silencing their cries for justice,**

2    **and were never intended to be fulfilled or acted upon**.

3         236.   Furthermore, instead of making academic accommodations on behalf

4    of Plaintiffs, Defendant USC, through such agents as Ms. Merriman and Ms.

5    Helsper, informed Plaintiffs that they could take "incompletes" in their classes.

6    This is not an "accommodation" but a standard academic possibility for students

7    who miss their finals. It is an option that puts students at an appreciable

8    disadvantage, requiring them to take their final exams months, if not up to one

9    year, after their courses, when the information and learning has gone stale.

10    Moreover, and "incomplete" carries with it a punitive effect, appearing as such on

11    a transcript while students may be attempting to get summer or permanent jobs,

12    and is translated to an "F" or non-passing grade if the examination is not taken

13    within a year. Despite this, due to USC's delays in addressing Plaintiff's academic

14    issues and failures in providing the promised academic accommodations, many

15    plaintiffs were forced to take incompletes in their classes.

16         237.   Those Plaintiffs that did not take incompletes on their final

17    examinations were largely forced to take final examinations as regularly scheduled,

18    during a time of immense stress and anxiety in their personal lives, caused in no

19    small part by Defendant as more thoroughly alleged in the preceding paragraphs of

20    this complaint. They have doubted their academic performance ever since and have

21    not achieved a finality in their academic affairs deserving of a college graduate.

22         238.   Those accommodations that were purported provided by Defendant

23    USC were provided much too late to avoid causing Plaintiffs the harm they allege

24    herein. Defendant then used their own delay as a double edged sword when, during

25    the Summer of 2013, after the finals period was over, Defendant refused to grant

26    Plaintiffs any further accommodation because, "academic accommodations are

27    inherently prospective in nature, not retroactive. If a student has a legitimate need

28    for an accommodation, it must be addressed before the time that the

48

accommodation can be applied, not after the accommodation could have been applied." (Source: August 2, 2013, letter from USC General Counsel James Ball, addressed to Attorney, Fred Dorton).

239.   Upon further information and belief, Plaintiffs allege that the promises complained of herein were also made with the purposeful intent to induce such reliance and satisfy the criticisms of the public, in order to minimize the negative press Defendant USC was receiving at the time, or alternatively were made recklessly for a similar purpose, and with indifference to the truth or falsity of the statements.

240.   **Plaintiffs heard the false promises**.

241.   **The public, at the town hall meeting, heard the false promises**.

242.   Defendant USC's false promises were especially important to Plaintiffs because they had final examinations scheduled to begin throughout the following two weeks and they were still in limbo as to whether the City Attorney's Office would file criminal charges and force them to face prosecution for crimes they did not commit.

243.   The statements were not taken by Plaintiffs as hollow attempts to appease the public and quiet the Plaintiffs' cries for racial equality**. Plaintiffs took Defendant USC at their word, placing a great deal of reliance on their promises, hoping that their educational institution actually meant what it said – that it would help them negotiate the academic and psychological harms they were facing, all to their inevitable harm and further exacerbation of their damages**.

244.   Subsequent to the Town Hall meeting, the Plaintiffs were left to make arrangements directly with their professors, despite the representations made by Dr. Jackson.

245.   This was problematic, **because in many instances Plaintiffs attempts were tardy and met with skepticism by their individual professors,**

**who also viewed them as criminals based on the (erroneous) fact that they had been arrested and were facing criminal charges (which were later dropped)**.

246.   Plaintiffs' reliance on Dr. Jackson's promises delayed their personal efforts to make arrangements for their own final examinations, and caused them to withhold or withdraw their efforts at achieving justice through the court of public opinion. **In effect – Defendant USC lied to Plaintiffs, and each of them, in order to appear sympathetic in the eyes of the public, while simultaneously knowing that they never intended to honor the promises made to plaintiffs – a ploy which worked for them, and continues to work to this day**.

247.   In actuality, the promises made by Defendant USC were made without ever intending to honor said promises, or in the very least were made by Dr. Jackson without having any reasonable basis in fact to believe USC would honor them.

248.   Plaintiffs and each of them relied on Defendant USC to honor the promises, while preparing for their final examinations and simultaneously facing criminal prosecution.

249.   Plaintiffs, and each of them, waited for Defendant USC to honor the promise.

250.   When it became apparent to Plaintiffs that Defendant USC would not honor their promise, Plaintiffs were forced to approach their teachers on their own, without the support of their academic institution, as promised, and in many cases, such attempts were too late. Several Plaintiffs were forced to take incompletes in their classes.

251.   Additionally, Plaintiffs, and each of them, have delayed seeking psychological counseling on the strength of Defendant USC's promises. This delay has further compounded Plaintiffs' trauma, and psychological damages.

252.   On information and belief, Defendant USC's promises, by and through its' agent, Dr. Jackson, were intended to induce Plaintiffs to, effectively,

SECOND AMENDED COMPLAINT

1  silence their cries for justice and appease their right to receive adequate and

2  appropriate accommodation.

3      253.   The promises were made purposefully to "save face" in the eyes of the

4  public, but, to-date, none of the promises Defendant USC made have been

5  honored.

6      254.   Immediately after the incident underlying this Complaint, Defendant

7  USC, by and through its agent and employee, then-Vice President of USC Student

8  Affairs Dr. Michael Jackson, confirmed in a packed auditorium during a May 7,

9  2013, Town Hall meeting that it was indeed unacceptable for the Plaintiffs to have

10 to hunt down their professors to seek academic accommodations and arrange their

11 own psychological counseling for the disruption these arrests caused.

12     255.   Defendant USC, by and through its agent and employee, then-Vice

13 President of USC Student Affairs Dr. Michael Jackson, made the affirmative

14 assurance of material and important fact that Defendant USC was going to provide

15 academic accommodations to Plaintiffs, and each of them, and made such

16 assurances with the intent that Plaintiffs relied on said assurances.

17     256.   It was reasonable, in light of Plaintiffs' circumstances at the time, that

18 they would rely on the assurances of Defendant USC to help them with academic

19 accommodations, especially in light of the fact that they had final examinations

20 coming in the two weeks following their wrongful arrests, and at the time

21 Defendant USC made these assurances, Plaintiffs were still forced to stand in

22 limbo as to whether the City Attorney's Office was going to file criminal charges

23 and force Plaintiffs to defend themselves in criminal court for crimes they did not

24 commit.

25     257.   As such, Plaintiffs, and each of them, placed significant reliance on

26 Defendant USC's promise to accommodate them academically, and provide to

27 them psychological counseling.

28     258.   Defendant's representations, however, were false and on information

51

and belief, then-Vice President of USC Student Affairs Dr. Michael Jackson knew they were false, or made the representations recklessly without regard for their truth.

259.   Defendant USC, on information and belief, never intended to honor the promise, and indeed, to this date, has not honored the promise and Plaintiffs have not been the afforded academic accommodations that were promised.

260.   As a direct and proximate result of Defendant USC's intentional misrepresentations, Plaintiffs have suffered additional exacerbation of the effects of the arrests, have been prevented from having any certainty or finality to their academic affairs, and suffered an inability to perform to their fullest potential as students during their academic finals, therefore hindering their future potential resulting in loss of earning capacity and emotional injuries all to their damages in a sum according to proof at trial.

## XVI.
## ELEVENTH CAUSE OF ACTION
## STATE LAW – NEGLIGENT MISREPRESENTATION
### (As Against USC)

261.   Plaintiffs repeat and re-allege each and every allegation of the paragraphs  above as though fully set forth herein, and, **as an alternative theory of liability** to paragraphs 218 through 260, allege as follows:

262.   Immediately after the incident underlying this Complaint, Defendant USC, by and through its agent and employee, then-Vice President of USC Student Affairs Dr. Michael Jackson, confirmed in a packed auditorium during a May 7, 2013, Town Hall meeting that it was indeed unacceptable for the Plaintiffs to have to hunt down their professors to seek academic accommodations and arrange their own psychological counseling for the disruption these arrests caused.

263.   Defendant USC, by and through its agent and employee, then-Vice President of USC Student Affairs Dr. Michael Jackson, made the affirmative

assurance of material and important fact that Defendant USC was going to provide academic accommodations to Plaintiffs, and each of them, and made such assurances with the intent that Plaintiffs relied on said assurances.

264.   It was reasonable, in light of Plaintiffs' circumstances at the time, that they would rely on the assurances of Defendant USC to help them with academic accommodations, especially in light of the fact that they had final examinations coming in the two weeks following their wrongful arrests, and at the time Defendant USC made these assurances, Plaintiffs were still forced to stand in limbo as to whether the City Attorney's Office was going to file criminal charges and force Plaintiffs to defend themselves in criminal court for crimes they did not commit.

265.   As such, Plaintiffs, and each of them, placed significant reliance on Defendant USC's promise to accommodate them academically.

266.   Defendant's representations, however, were false and then-Vice President of USC Student Affairs Dr. Michael Jackson had no reasonable grounds for believing them to be true.

267.   Defendant USC, to this date, has not honored the promise and Plaintiffs have not been the afforded academic accommodations that were promised.

268.   As a direct and proximate result of Defendant **USC's** negligent misrepresentations, Plaintiffs have suffered additional exacerbation of the effects of the arrests, have been prevented from having any certainty or finality to their academic affairs, and suffered an inability to perform to their fullest potential as students during their academic finals, therefore hindering their future potential resulting in loss of earning capacity and emotional injuries all to their damages in a sum according to proof at trial.

///

///

SECOND AMENDED COMPLAINT

# XVII.

## __PRAYER__

WHEREFORE, each PLAINTIFF prays for judgment against Defendants and each of them as follows:

a)    Past, present and future compensatory general and special damages in amounts according to proof;

b)    Exemplary damages, ONLY as against each INDIVIDUAL police officer, supervisory, and policy maker defendant - as spelled out in each cause of action, in an amount sufficient to deter and to make an example of each said individual defendant;

c)    Reasonable attorneys' fees and litigation expenses pursuant to 42 U.S.C. §1988;

d)    Costs of the suit necessarily incurred herein; and

e)    Such further relief as the Court may deem just or proper.

///
///
///
///
///
///
///
///
///
///
///
///
///

54

1

Dated: January 9, 2015                    BOUCHER LLP

2

By:  _/s/ Brian M. Bush_____

3

BRIAN M. BUSH, ESQ

4

5

**BOUCHER, LLP**

RAYMOND P. BOUCHER, ESQ. (SBN 115364)

6

BRIAN M. BUSH, ESQ. (SBN 294713)

7

21600 OXNARD STREET, SUITE 600

WOODLAND HILLS, CA 91367

8

TEL: (818) 340-5400

9

FAX: (818) 340-5401

10

THE D FIRM, A PROFESSIONAL LAW

CORPORATION

11

By:  _/s/FRED DORTON_____

12

13

FRED DORTON, ESQ.

14

15

*Attorneys for Plaintiffs*

16

17

18

19

20

21

22

23

24

25

26

27

28

SECOND AMENDED COMPLAINT

XVIII.

## DEMAND FOR JURY TRIAL

PLAINTIFFS, and each of them, respectfully demand that the present matter be set for a jury trial.

Dated: January 9, 2015                 BOUCHER LLP

By:  _/s/ Brian M. Bush_
        BRIAN M. BUSH, ESQ

**BOUCHER, LLP**
RAYMOND P. BOUCHER, ESQ. (SBN 115364)
BRIAN M. BUSH, ESQ. (SBN 294713)
21600 OXNARD STREET, SUITE 600
WOODLAND HILLS, CA 91367
TEL: (818) 340-5400
FAX: (818) 340-5401

THE D FIRM, A PROFESSIONAL LAW CORPORATION

By:   _/s/FRED DORTON_
        FRED DORTON, ESQ.

_Attorneys for Plaintiffs_

56

SECOND AMENDED COMPLAINT